## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Patrick T. Casey, with the Federal Bureau of Investigation (FBI), being duly sworn, state the following is true and correct to the best of my knowledge and belief:

1.     I am a Special Agent Bomb Technician for the FBI and have been so employed since October 2002.  I am currently assigned to the Kansas City Division, Jefferson City Resident Agency, where I am assigned to the Joint Terrorism Task Force (JTTF).  In that capacity, I have been involved in investigations of both international and domestic terrorism, and I have experience in terrorism threat assessment and mitigation.  During my career in the FBI, I have acquired knowledge and information about bombing matters from training, informants, defendants, other law enforcement officers, and other bombing investigations with which I have been involved.  As a Special Agent with the FBI, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

2.     The statements in this affidavit are based on my personal knowledge and observations, my training and experience, my review of documents and records, and information obtained from other agents and witnesses with direct knowledge of the facts of this case.  Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe necessary to establish probable cause for the pertinent offense.  Where statements are described in this affidavit, they are  described in their sum and substance and not necessarily verbatim.

3.     I make this affidavit in support of a criminal complaint charging defendant ROBERT LORENZO HESTER, JR., a/k/a "Mohammed Junaid Al Amreeki," a/k/a "Junaid Muhammad," a/k/a "Rabbani Junaid Muhammad," a/k/a "Rami Talib," a/k/a "Ali Talib

1

Muhammad," with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B. I assert that there is probable cause to believe HESTER violated Section 2339B based on the following facts:

## OVERVIEW

4. HESTER posted a variety of material on multiple social media accounts. The FBI was made aware of those postings, which indicated that HESTER had converted to Islam, expressed animus toward the United States, and posted photos of weapons and the ISIS flag, among other material, suggesting an adherence to radical Islamic ideology and a propensity for violence. In order to assess whether HESTER posed a security threat, the FBI undertook a series of investigative steps, beginning with an examination of whether and to what extent HESTER would engage directly online with confidential sources working for the FBI and, later, with FBI employees working in an undercover capacity.

5. HESTER did engage online with these undercover personnel and based on the substance of HESTER's statements in those conversations, the FBI was unable to discount HESTER as a potential security threat. HESTER said, for example, that the U.S. government should be "overthrown," and he suggested "hitting" the government "hard," while noting that it would not be "a one man job." HESTER identified categories of potential targets for attack, including "oil production," "military bases," "federal places," "government officials," and "Wall Street." HESTER specified that "[a]ny government building in DC would get attention of everyone." He said he wanted a "global jihad." Citing his brief enlistment in the U.S. Army, HESTER also claimed proficiency with "assault weapons" and said that his favorite firearm was the AK-47 rifle. HESTER spoke about the perceived ease in which one could gain access to a military base.

2

6.      HESTER thereafter established that he would act on the statements that he made online. An undercover FBI employee conversing online with HESTER offered HESTER an in-person meeting with a like-minded "brother." HESTER agreed to meet and subsequently did meet on numerous occasions with a person who was described as, and HESTER believed was, a terrorist operative – but who, in reality, was an employee of the FBI working in an undercover capacity. In the meetings, the FBI undercover made clear to HESTER that the undercover was representing a foreign terrorist organization (ISIS) and that the undercover was planning an attack that would involve multiple operatives, deploy bombs and guns, and result in mass casualties. HESTER indicated through his statements and actions that he was ready and willing to participate and assist in the "plot." For example, he obtained, at the undercover's request, items that he was told would be used as bomb components, including boxes of roofing nails. The undercover made clear to HESTER that the nails' purpose was to maximize the number of casualties. In addition, HESTER did not hesitate when the undercover showed him a cache of three machine guns and two handguns that would be used in the "attack," and two pipes that would be used to construct the "bombs." In fact, in the days after seeing this display, which was arrayed in the rear compartment of the undercover's SUV, HESTER provided information on storage units that could be used to hold the weapons and agreed to obtain additional supplies for the operation.

7.      Throughout the investigation, HESTER expressed his interest in and exhibited his willingness to commit violence in support of a foreign terrorist organization. The facts, as described in more detail below, establish that HESTER attempted to provide material support to ISIS by assisting in what he believed would be a murderous terrorist bombing and gunfire attack committed in the name of the foreign terrorist organization.

3

## THE DESIGNATED FOREIGN TERRORIST ORGANIZATION

8.     On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the ISIL listing: The Islamic State of Iraq and al-Sham (ISIS), The Islamic State of Iraq and Syria (ISIS), ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

## HESTER'S BACKGROUND AND SOCIAL MEDIA POSTINGS

9.     HESTER is a U.S. citizen who was born and currently resides in Missouri. In late 2012, he enlisted in the U.S. Army. HESTER completed basic training, which included training with firearms and small-unit combat tactics. During Advanced Individual Training, HESTER was cited for numerous violations of U.S. Army regulations. In mid-2013, HESTER received a general discharge from service.

10.     The FBI became aware of HESTER in or about August 2016 based on reports from multiple confidential sources who had observed public posts initiated by HESTER, under the alias "Rabbani Junaid Muhammad," on a popular social media platform (the "social media platform").

4

The source reports reflected statements by HESTER concerning his conversion to Islam, his hatred for the United States and his belief that supposed U.S. mistreatment of Muslims had to be "put to an end." The reports also noted that HESTER had posted numerous photographs of automatic weapons and ammunition, including one photograph of a handgun and a knife next to the Quran. The reports also indicated that, on August 14, 2016, HESTER selected as a profile picture for two of his accounts on the social media platform an image of the Black Flag of Tawhid. I know from my training and experience that ISIS has co-opted the Black Flag of Tawhid as its flag and that the flag has regularly been featured in ISIS propaganda videos.

11. In September 2016, the FBI undertook a review of HESTER's publicly available posts on the social media platform. That review revealed a profile description, "Zionist Jew Pig Redneck Hunting Super Assassin," and the following posts, among others:

        a.      A post on or about July 4, 2016, under the alias "Rami Talib," stating: "Isis created by U.S. And Israeli government. A true Muslim would never commit suicide bombing during Ramadan at the Prophets (pbuh) masjid";

        b.      Posts on or about August 16, 2016, under the alias "Junaid Muhammad," stating, "Burn in hell FBI," and referring to a certain encrypted messaging application as "no longer safe";

        c.      A post on or about September 30, 2016, under the alias "Ali Talib Muhammad," stating: "Brothers in AmurdiKKKa we need to get something going here all those rednecks have their little militias why shouldn't we do the same";

        d.      Two other posts on or about September 30, 2016, under the alias "Ali Talib Muhammad," referred to a group called "The Lion Guard": "Look Out Here Comes The Lion Guard" and "Join the Lion Guard." In response to a comment on the social media

5

platform, HESTER explained: "It started as a cartoon my children watch but i would like to take in a new direction a group of lions to guard the ummah." I know from my training and experience that "ummah" is an Arabic word meaning the entire Muslim community. I also know from my training and experience that some Islamic extremists, including ISIS supporters, like to refer to themselves as lions, and use references and images of lions to identify themselves as jihadists;

e.  A post on or about October 1, 2016, under the alias "Ali Talib Muhammad," stating: "I want to get a movement going here in Amurdikkka we need people to come together though to make things happen"; and

f.  Another post on or about October 1, 2016, under the alias "Ali Talib Muhammad," stating in the form of a caption to a photograph of a fully loaded magazine: "Won't be any clowning around my home."

## HESTER'S LOCAL ARREST

12.  On or about October 3, 2016, HESTER was arrested by the Columbia, Missouri, Police Department after an incident in the parking lot of a grocery store. HESTER was in the store's parking lot and appeared to be in an argument with his wife. Hester then threw a folded pocket knife through a plate-glass window near the entrance of the store. When store employees confronted HESTER, he assumed an aggressive stance, forcefully placed his hand into the diaper bag he was carrying, in a manner that appeared to be reaching for a weapon, and yelled that he did not want "any of this" and that he would "fucking do it." Columbia police later recovered a 9-millimeter handgun from the diaper bag. The handgun resembled the handgun that HESTER posted pictures of on the social media platform.

6

13.     HESTER was charged in state court with a felony count of property damage, a felony count of unlawful use of a weapon, and a misdemeanor count of assault.   HESTER remained in custody until on or about October 13, 2016, when he was released on bond.   His bond conditions included electronic monitoring.

14.     On or about January 17, 2017, a warrant was issued for HESTER's arrest for a violation of his bond conditions, which I know from this investigation was a positive urinalysis for marijuana.   On or about January 24, 2017, HESTER pleaded guilty to one count of felony property damage and one count of unlawful use of a weapon, and was released on his own recognizance pending a sentencing hearing that was scheduled for March 2017.   HESTER was no longer on electronic monitoring after that date.

### HESTER'S STATEMENTS TO UC-1

15.     On or about October 2, 2016, the day before HESTER's arrest, an FBI employee using an undercover identity (UC-1) accepted a friend request on the social media platform from HESTER, who was using the alias "Ali Talib Muhammad."   The FBI tasked UC-1 to learn more about "The Lion Guard" by contacting HESTER via the private messaging function on the social media platform.   On October 15, 2016, two days after HESTER was released from pretrial detention, UC-1 contacted HESTER by private message, stating that UC-1 liked HESTER's idea about "The Lion Guard" (referred to above) and asking whether HESTER had made any progress.   HESTER responded that he had not made progress, noting his recent arrest, but added that he was "serious about the guard."   HESTER explained that "we just need some more brothers and sisters on the same page as you and i it can be done with patience and dedication."

16.     On October 16, 2016, HESTER shared a post on the social media platform that contained a news article about recent U.S. bombings in Yemen, which HESTER described in a

7

post as "USA terrorism." When UC-1 contacted HESTER via the private messaging function on the social media platform, HESTER observed that "america is about to get rough." UC-1 explained why it was "already rough" and asked HESTER whether it could get any rougher. HESTER opined that the country would not "last much longer." HESTER said that the U.S. government should be overthrown, that "hitting govt hard" was a starting point, but that it was "not a one man job." UC-1 agreed and asked whether HESTER had a plan or needed help, noting that UC-1 had recently met "with some brothers" who were talking about the same thing. HESTER said that he was "looking into it now" and that he "would like talk with these people" to "come up with some serious ideas." In response to UC-1's suggestion that they talk further, HESTER stated: "We need to find a secure means of communication first. We will need brothers all over the place." HESTER said he would find out more about secure communications, including a particular encrypted messaging application (the "encrypted messaging app").

17. On October 17, 2016, HESTER and UC-1 engaged in another discussion, which began on the social media platform and then moved to the encrypted messaging app. In the portion of the discussion on the social media platform, UC-1 again asked HESTER about his plan, to which HESTER responded: "We need to hit hard where it counts i was thinking oil production and federal places." HESTER continued: "Government officials also need to be taken care of but we must hurt the economy." HESTER added that "it can be done but we need some big help." HESTER reiterated his desire for "encrypted communication," stated that they should use the encrypted messaging app, and he set up an account while conversing with UC-1. When their discussion resumed on the encrypted messaging app, HESTER noted that this was a "[m]uch safer" means of communication than the social media platform. UC-1 raised the subject of firearms,

8

Case 4:17-cr-00064-DGK   Document 1-1   Filed 02/19/17   Page 8 of 24

suggesting that he might send HESTER a photograph of two AK-47 rifles that "the brothers" had moved for someone. HESTER responded: "Aks are my favorite weapon."

18.     On October 18, 2016, HESTER and UC-1 communicated again over the encrypted messaging app, a conversation that began with UC-1 sending to HESTER the previously mentioned photograph of the AK-47 rifles. HESTER said he wanted one of the rifles and that he would "love to shoot the kufr with [it]." Based on my training and experience, I am aware that "kufr" (or "kuffar") is an Arabic term that means "non-believers" or "infidels," and in this context, I believe HESTER is referring generally to Americans. HESTER stated: "I want to actually make a difference and change this entire world a global jihad." HESTER reiterated that he was trying to find like-minded people to help.

19.     On October 19, 2016, HESTER and UC-1 communicated again via the encrypted messaging app. HESTER began the conversation by stating that "[o]il production has to be shut down to control the governments movements." UC-1 asked HESTER whether there was an oil pipeline near him, to which HESTER said he would find out by researching. (For security purposes, UC-1 also confirmed during this conversation that HESTER was not in possession of a firearm, a gun having been confiscated from HESTER in connection with the October 3 local arrest.) Toward the end of the discussion, UC-1 referred again to the "brothers" with whom UC-1 associated, explaining that they traveled to mosques around the country to meet with other brothers. HESTER said he would like such a meeting.

20.     HESTER and UC-1 maintained regular contact via the encrypted messaging app, as well as by exchanging text messages on October 29, 2016 and October 30, 2016 on the subject of potential targets for their attacks. On October 29, HESTER said that after checking on oil production he found that there was an oil plant in Missouri. UC-1 said that the "brothers" liked

9

HESTER's idea of "messing with the economy." HESTER's response was that Texas was "the biggest state for oil production" but that he was "looking into headquarters for oil production and CEO names etc," presumably those located in Missouri. On October 30, HESTER said that the oil companies in Missouri were "small scale" and when UC-1 asked whether Missouri had "anything else," HESTER said there were military bases, which he noted were easy to access as "long as [you] have state ID." HESTER also suggested "Washington DC" and "Wall Street," without naming any particular targets. HESTER added that "[a]ny government building in DC would get attention of everyone." Regarding targeting a military base, HESTER noted his prior military service to reveal that he was "trained really well with assault weapons." UC-1 reminded HESTER about the "brothers" who travel around the country and said that one of them would be in the area "in a couple of weeks" and would like to meet HESTER. HESTER did not respond and the conversation ended.

21. On the next day, October 31, 2016, HESTER initiated a text message conversation with UC-1. HESTER started by apologizing for abruptly ending the previous day's discussion and stating that he "would love to meet with the brother." HESTER continued to talk about accessing military bases, identifying a Missouri base by name. At the conclusion of the text message conversation, HESTER sent UC-1 a link on the encrypted messaging app to a particular channel, which I know from my training and experience is an invitation-only channel that is pro-ISIS and provides updates on fighting in Iraq, Syria and elsewhere.

### HESTER'S FIRST MEETING WITH UC-2

22. On November 3, 2016, UC-1 told HESTER via the encrypted messaging app that "one of the brothers" UC-1 had previously mentioned would be in Missouri next week and able to meet with HESTER. This "brother" was another FBI employee working in an undercover capacity

and will be referred to herein as UC-2. HESTER suggested that UC-1 give UC-2 HESTER's telephone number. On November 7, 2016, UC-1 told HESTER via the encrypted messaging app that UC-2 was able to meet with HESTER the next day and UC-1 and HESTER worked through the logistics of how UC-2 and HESTER would meet.

23. On November 8, 2016, HESTER met with UC-2. The meeting, which lasted about 30 minutes, took place in UC-2's vehicle, while it was parked outside of HESTER's residence in Columbia, Missouri. The meeting was audio and video recorded, as were HESTER's subsequent meetings with UC-2. For this first meeting, HESTER brought his two young children, which HESTER explained could not be avoided, given his child care responsibilities that day. During the meeting, HESTER and UC-2 discussed a broad range of topics, including their respective backgrounds, employment, race and religion. The discussion also included the following:

    a.    UC-2 began the conversation by explaining that UC-2 was visiting HESTER at the request of a "brother" but that UC-2 was unaware of the purpose of the visit. UC-2 said he did not know HESTER and was not sure what HESTER was looking for. UC-2 explained that UC-2 could not "be too careful" and HESTER said he understood.

    b.    HESTER said, "I don't like America, like for my kids." UC-2 explored the basis for this view, which led to a discussion about Islam. HESTER explained that he was still learning the religion and was often confused by what he heard from "brothers" online. UC-2 asked if HESTER was "looking for an Islamic state." HESTER said "yes." HESTER said he wanted to move, but his familial circumstances prevented it. HESTER was not satisfied with the teachings at the local mosque, which he found to be "[v]ery moderate

and very watered down." HESTER said he believed that "Sharia is the only law" that should matter.

       c.    UC-2 said he would contact HESTER again, but through the other "brother" (meaning UC-1), because even though HESTER seemed like a "good brother," in UC-2's view, UC-2 still did not know HESTER very well. HESTER said he understood, noting for emphasis that he "grew up in the hood, man." Based on my training and experience, I believe that HESTER added the reference to his upbringing to convey his awareness that UC-2 was vetting him for participation in an illicit endeavor.

       d.    After goodbyes were exchanged, and right before HESTER left the vehicle, he said: "I want to do something for all the kids, . . . this entire generation of Muslim children," adding that "they need to be able to respect it as Muslims, as people, as human beings."

24.    Later on November 8, 2016, after his meeting with UC-2, HESTER reached out to UC-1 on the encrypted messaging app and said: "I like the brother he is very smart." HESTER thanked UC-1 for "vouching" for HESTER.

## HESTER'S NEXT TWO MEETINGS WITH UC-2

25.    HESTER and UC-1 maintained regular contact. On November 28, 2016, HESTER inquired whether UC-1 had "heard from" UC-2. UC-1 said he would check, and shortly thereafter, told HESTER that UC-2 was going to be in town over the next several days and would be able to see HESTER. HESTER said that was "great news."

26.    On November 30, 2016, UC-2 met HESTER at HESTER's place of business and gave HESTER a ride home. Their conversation, the majority of which took place in UC-2's vehicle, lasted about 30 minutes and touched on a number of subjects, including more on

HESTER's background, the reasons he converted to Islam, and his desire to learn more about the religion. The discussion also included the following:

   a.     UC-2 provided HESTER with $100, stating that in light of the things HESTER said he was going through during their first meeting "this is one job that one brother is supposed to do to another," and "it's my duty to make sure that the brother is okay."

   b.     Throughout the conversation, HESTER repeatedly denied smoking marijuana. I know from my training and experience that smoking is forbidden under Islamic law and custom; and as noted above, on or about January 17, 2017, a urinalysis in connection with HESTER's state case was positive for marijuana.

   c.     UC-2 explained to HESTER that UC-2's job to was make sure "that you are who you are," meaning to assess whether UC-2 could vouch for HESTER with the "brothers." HESTER understood that their conversation would end if UC-2 could not verify his sincerity. UC-2 told HESTER that they would meet again the next day and UC-2 said that at that time UC-2 would "see if you are who you really are." HESTER expressed his appreciation for UC-2 taking time to meet with him, and agreed to meet the next day.

27.     On December 1, 2016, HESTER reached out to UC-1 via the encrypted messaging app and said that he felt good after talking to UC-2 the previous day. Later that day, UC-2 picked up HESTER at work and drove HESTER home. During the meeting HESTER and UC-2 discussed the following:

   a.     UC-2 asked HESTER to explain, for the first time, what HESTER had discussed with UC-1. HESTER said that instead of "three or four guys . . . shootin' up somewhere," he wanted to do "things that could actually make a difference like doing

13

something to the economy and stuff, things to hurt the economy." HESTER said that "instead of fighting hand to hand combat," he "was thinking about oil lines, hitting oil pipelines and oil markets." HESTER also suggested hurting the economy by getting into "computer systems and stuff."

   b.    UC-2 repeatedly told HESTER that he could disassociate himself from the operation at this time because "this is real." But as they sat in the vehicle parked in front of HESTER's home, UC-2 cautioned that once HESTER committed himself, there would be "no turning back." HESTER confirmed that he understood, left the vehicle to take items into the residence, but returned to continue the conversation. After thoroughly explaining to HESTER that it was acceptable for him to decide to take care of his family rather than be involved in the operation, HESTER said, "I'm in." HESTER explained, "I wanna help the brothers and sisters anyway I can," which included "fighting skills," helping "spread the word," and training others on "everything I was taught in the Army," such as "[e]verything about weapons," and "how they move."

   c.    During the conversation, HESTER stated that he has never killed another person, but described two instances in which he fired gunshots at other persons. To date, the investigation has not yielded any information to confirm the veracity of these statements.

   d.    UC-2 asked HESTER if he was "willing to make that sacrifice." HESTER responded: "I can't say yes like I'm ready to die because I don't know where I sit with Allah right now." When asked whether he was willing to leave his family if he could receive safe passage to travel to fight, HESTER stated, "Yes," because the risk of death was no different than when he joined the army.

14

e.      Before the conclusion of the meeting, UC-2 reiterated that HESTER could be part of the operation or could disassociate himself from it.   At the same time, for security reasons, UC-2 was adamant that HESTER did not have a third option to engage in any sort of violence on his own or participate in some other operation of which UC-2 was unaware. UC-2 insisted that HESTER promise that he would engage in no such thing and UC-2 threatened to come back and find HESTER if he learned that HESTER reneged on the promise.   For emphasis, and for the purpose of mitigating the security threat posed by HESTER, UC-2 displayed a knife and reminded HESTER that UC-2 knew where HESTER and his family lived, among other forceful words.

28.      On December 6, 2016, HESTER had a conversation with UC-1 via the encrypted messaging app, in which HESTER complained about UC-2's forceful commentary at the end of the December 1 meeting.   HESTER explained to UC-1 that UC-2 had threatened to harm HESTER and his family if HESTER "talked about any plans" or "planned without letting him [UC-2] know." HESTER said he was not scared, but that it was wrong for UC-2 to threaten his family and that HESTER did not "like being treated like a snitch."   HESTER asked UC-1 not to raise the matter with UC-2 because HESTER did not "want to have to kill someone for running up on [HESTER's] family."

### HESTER'S LATE DECEMBER MEETINGS WITH UC-2

29.      Notwithstanding his complaints about UC-2, HESTER met with UC-2 twice in late December 2016.   On December 20, 2016, UC-2 picked up HESTER at work and drove him home. During the meeting, HESTER and UC-2 discussed the following:

a.      UC-2 stated that UC-1 had confirmed that HESTER had stayed off of social media as instructed, which was a reference to the type of proactive steps that UC-2 had

warned against in their last meeting. UC-2 explained to HESTER that those instructions were a test. HESTER said he did not know that, but that he was nervous about law enforcement anyway.

      b.      HESTER stated that there were persons that contacted him on social media that "could've been feds" because of the questions they asked. HESTER did not think that either UC-1 or UC-2 were like that, but he had cut people out of his life because he was not trying to "go to the penitentiary right now."

      c.      UC-2 reiterated that HESTER was not to do anything without letting UC-2 know to avoid messing up what was planned because it involved a "big network" and would take time, which HESTER understood and was "comfortable with."

      d.      At the end of the conversation, UC-2 provided HESTER with a "clean phone" to use, stating that UC-2 would provide HESTER with minutes for the phone the next time they met.

30.      On December 21, 2016, UC-2 again picked up HESTER at work and drove him home. During the meeting, HESTER and UC-2 discussed the following:

      a.      UC-2 began by stating that UC-2 was telling "the brothers" about HESTER, when HESTER said that he could not wait to be off of electronic monitoring. UC-2 stated that the told the "brothers" that HESTER would hopefully be off monitoring soon, and told HESTER that UC-2 "just wanted to remind" him that "the Islamic State is coming."

      b.      UC-2 gave HESTER cards containing minutes to use on the phone UC-2 provided the day before. UC-2 stated that the minutes should last until he returned around the end of January, when HESTER expected to be off of electronic monitoring.

c.      HESTER stated that his car broke down after someone pointed a gun at HESTER and HESTER shot at the other car. HESTER believes that the other car must have shot back at him and disabled his car because it has not worked since that incident. To date, the investigation has not yielded any information to confirm the veracity of this statement.

d.      HESTER and UC-2 discussed HESTER's desire to leave Missouri and HESTER's ability to leave his mark on Missouri when he does. UC-2 told HESTER, "Just know you got the brothers from the Islamic State supporting you now," to which HESTER expressed his appreciation. UC-2 stated that if HESTER was ready to leave Missouri, "we'll leave with something to remember." HESTER said, "Okay, that sounds like a plan."

## HESTER'S NEXT TWO MEETINGS WITH UC-2

31.      As noted above in connection with HESTER's state criminal case, he was taken off electronic monitoring on January 24, 2017. In an exchange of text messages on January 28, 2017, HESTER told UC-1 that he and his family were thinking of moving, with St. Louis and Houston being destinations they considered. The next day, January 29, 2016, UC-1 told HESTER via text message that UC-2 would be in Missouri next week and wanted to meet with HESTER. HESTER said he was looking forward to the meeting.

32.      On January 31, 2017, UC-2 met with HESTER in UC-2's vehicle while it was parked outside of HESTER's residence. Their discussion, which was brief, included the following statements:

a.      HESTER told UC-2 that he was off of electronic monitoring, but had gone back to jail because he "got pulled over with somebody and they had weed in the car with 'em." HESTER later described how the car had been pulled over because of tinted

17

windows. Based on the investigation to date, I believe that both of these statements were false.

b.    HESTER stated that he broke the phone UC-2 had given him, because he was scared and did not want anyone to get it. UC-2 commended HESTER, saying that he "did good" and that it showed that HESTER was thinking because "it's not just about you." UC-2 told HESTER that the "brothers" were moving ahead with plans and that HESTER's discarding of the phone was appreciated as "a small gesture [that] goes a long way in the next step."

c.    UC-2 provided HESTER a list of items for HESTER to purchase and stated that he needed the list back from HESTER the next day. The list, which was written on a paper napkin, included 9-volt batteries, duct tape, copper wire, and roofing nails. HESTER stated that he would purchase the items but that he did not have the money to do it that night. After UC-2 confirmed that HESTER could not get the money, UC-2 provided HESTER with $20 to purchase the items, which HESTER agreed to repay when he could. UC-2 implied that the items would be used to make bombs, stating that those materials are needed "to make . . . things . . . to bring some kind of destruction." HESTER responded by stating: "I'm just ready to help. I'm ready to help any way I can."

d.    When UC-2 stated what they are planning is "going to bring them to their knees. . . . and then they gonna know to fear Allah," HESTER expressed his anticipation by stating: "I can't wait. I can't wait."

e.    UC-2 and HESTER agreed that when UC-2 arrived at HESTER's home the next day, HESTER would open his garage door so UC-2 could back into the garage, because UC-2 would have something to show HESTER.

18

33.    Later that day, HESTER told UC-1 via text message that he was "going shopping in the morning." The next morning, February 1, 2017, HESTER purchased 9-volt batteries, duct tape, and two boxes of roofing nails. HESTER purchased the items from a retail store whose business was international in scope. A surveillance video obtained from the store depicted HESTER making the purchase. Thereafter, HESTER told UC-1 via text message that he had purchased all but one of the items, noting that he could not find "wires for the fence."

34.    Later on February 1, 2017, HESTER met UC-2 at his residence. Prior to the meeting, the FBI loaded various items into the rear compartment of the SUV UC-2 would be driving to the meeting. The items included three AK-47 style rifles and two .45 caliber handguns, all of which had been rendered incapable of discharge. The items also included a backpack containing two pieces of pipe (one metal, one plastic) with end caps attached in the manner of pipe bombs, along with some cord-like safety fuse. When UC-2 arrived at HESTER's home, UC-2 backed the vehicle toward HESTER's garage and HESTER opened the lift gate, as previously agreed. While standing at the back of the vehicle, UC-2 and HESTER discussed the following:

   a.    HESTER provided UC-2 with a bag containing the 9-volt batteries, duct tape, and roofing nails he purchased earlier that day. UC-2 asked for the list provided to HESTER the day before and the receipt for the items. HESTER did not have the receipt, but provided UC-2 the list, explaining that he spent $22 but could not find the copper wire. UC-2 made it appear to HESTER as if UC-2 had burned the list; in response, HESTER stated "I was gonna do that." (The actual list was preserved as evidence.)

   b.    UC-2 told HESTER that before showing HESTER the surprise UC-2 brought for him, HESTER needed to understand what was about to happen. UC-2 told HESTER that buying the items and returning the list was another test and UC-2 liked how

19

HESTER handled things so far. UC-2 told HESTER that they were planning something "ten times more" than the Boston Marathon bombing, and HESTER expressed his approval.

c. UC-2 told HESTER that there were various "kufr" holidays coming up and they were planning on "killing a lot of people," and HESTER expressed his approval.

d. UC-2 told HESTER that the Boston Marathon bombers were caught because they were working alone, but that UC-2 was working with ISIS and that what UC-2 was working on was coordinated. HESTER acknowledged that he understood this and UC-2 stated "[s]o all ISIL warriors that we have here with us . . . welcome, brother." HESTER expressed his approval.

e. UC-2 told HESTER that if HESTER was "not down" or not "willin' to handle this," then HESTER could "walk away." HESTER said, "I'm down." UC-2 said they were going to "wage all kinda war," and HESTER again expressed his approval.

f. At this point in the conversation, UC-2 pulled back blankets that were covering the items in the back of the SUV, exposing the three AK-47 style rifles and two .45 caliber handguns. HESTER recognized what the firearms were and stated, "[t]hat's my kind of expertise there." HESTER explained that while he had shot an "AK," he did not know how to break one down, adding that he could do both with an M-16 because of his military service. HESTER also stated he used to own a .45.

g. UC-2 stated that while they had plenty of firearms, they needed more ammunition, and HESTER stated that he could not purchase ammunition because of his present state charges but that he had a friend that could get ammunition for him. HESTER stated that he would have money to purchase ammunition after he received his tax refund and after he was paid in a couple of weeks.

20

h.      UC-2 opened the backpack, which contained the pipes and fuse, stating that "these are bombs right here."   UC-2 explained that the duct tape HESTER provided would be used to tape the bombs together, which HESTER acknowledged.   UC-2 stated that they had more backpacks that they were going to put in different locations, being careful not to be caught on cameras.   HESTER acknowledged that he understood.

i.      HESTER stated that they had to be smarter than the Boston Marathon bombers, and stated that he remembered all of his military training, including how to clear  a room or building, how to use weapons, and military movements.

j.      HESTER again confirmed that he was "down" and that he understood that they had to "lay low" and act in a manner to avoid detection.

k.      UC-2 stated that the nails HESTER provided would "cut peoples head's off," and HESTER responded, "Oh yes. Oh yeah. I know," indicating that HESTER understood that the nails were to be used as shrapnel for bombs.   UC-2 stated: "You cuttin' peoples' heads off.   We . . . gonna leave a force of reckonin' on them so so brutal that they gonna, they ain't gonna have time to recuperate or be lookin' like know what happening, like oh, man, we gotta back up on all you brothers," to which HESTER expressed his approval.

l.      UC-2 stated that they were going to "strike fear in all these infidel hearts," and HESTER responded that he agreed and that he was ready.

**HESTER'S FURTHER STATEMENTS TO UC-1**

35.      On or about February 2, 2017, HESTER sent UC-1 the following text messages: "I should have some more stuff for the brother in a couple of weeks when I get paid"; "I will help

21

anyway I can . . . if not us who will"; and "When you talk to the brother again let him know I'll have some more gifts in a couple of weeks."

36.     On February 4, 2017, HESTER and UC-1 had a conversation via the encrypted messaging app, at UC-1's request.  UC-1 asked HESTER if he would find the addresses for storage units in the Columbia area, directing HESTER's attention to "what the brother showed [him.]" HESTER agreed to find the addresses and, with respect to what he was shown, HESTER said: "I was like a kid in candy store when I seen lol."

37.     On February 6, 2017, HESTER reported back to UC-1 via the encrypted messaging app.  HESTER provided UC-1 with names and addresses for five local storage facilities.  When UC-1 said that the "brothers" were concerned about video surveillance at the facilities, HESTER reported that he was "seeing a lot of these [facilities] have cameras" and that he was to determine precise locations of the cameras.

38.     On February 7, 2017, HESTER and UC-1 again communicated over the encrypted messaging app.  After an exchange of greetings, HESTER asked how the "party plans" were progressing and offered to help in any way.  Shortly thereafter, UC-1 opined: "Once this is over and the kafir are counting their dead They will know that the Islamic State Caliphate has spread into the United`States."  HESTER said he was excited, that he was "happy to be part" of it, and that it was "time they answer for their atrocities."  HESTER predicted that it was "going to be a good day for Muslims worldwide."

39.     On February 11, 2017, HESTER contacted UC-1 via the encrypted messaging app and asked how the "party plan" was coming along.  In discussing the planned operation, HESTER said that he would try to get more "supplies."

40.    On February 16, 2017, HESTER and UC-1 had another conversation over the encrypted messaging app.  UC-1 told HESTER that the "party" would take place on Presidents' Day (that is, February 20, 2017) and that the targets of the operation would include buses, trains and a train station in Kansas City, Missouri.  HESTER expressed approval and asked UC-1 whether particular "supplies" were needed.  UC-1 said they needed shrapnel, mentioning nails and screws as examples.  HESTER said he would "pick some things up" and added that it felt "good to help strike back at the true terrorist."

### HESTER'S FEBRUARY 17 MEETING WITH UC-2

41.    On February 17, 2017, UC-1 advised HESTER that UC-2 was in town and ready to meet and HESTER agreed to meet UC-2.  UC-2 met HESTER in front of HESTER's residence and HESTER joined UC-2 in the front seat of UC-2's vehicle.  HESTER had with him a plastic bag, which was later determined to contain two boxes of roofing nails, among other items.  UC-2 and HESTER drove to a nearby storage facility, which was one of the facilities HESTER previously identified in his communications with UC-1.  Upon arrival at the storage facility, HESTER and UC-2 briefly conducted surveillance and discussed the location of the facility's security cameras. Shortly thereafter, HESTER was arrested.

## CONCLUSION

42.     Based on the above facts, I believe that probable cause exists for the issuance of a complaint charging HESTER with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

Patrick T. Casey, Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 19th day of February, 2017.

Hon. Robert E. Larsen
United States Magistrate Judge
Western District of Missouri