# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,

v.

ROBERT LORENZO HESTER, JR.,

           Defendant.

Case No. 17-00064-01-W-DGK

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1. **The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Timothy A. Garrison, United States Attorney, and Brian P. Casey and David Raskin, Assistant United States Attorneys, and the defendant, Robert Lorenzo Hester, Jr., ("the defendant"), represented by Troy K. Stabenow.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2. **Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to Count Two of the indictment charging him with a violation of 18 U.S.C. § 2339B, that is, attempted provision of material support or resources to a designated foreign terrorist

organization. By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is in fact guilty of this offense.

3. **Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offense to which he is pleading guilty are fairly and accurately stated in Attachment A to this plea agreement.

4. **Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

5. **Statutory Penalties.** The defendant understands that upon his plea of guilty to Count Two of the indictment charging him with attempted provision of material support or resources to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B, the maximum penalty the Court may impose is not more than 20 years of imprisonment, a $250,000 fine, ~~3 years~~ lifetime of supervised release, and a $100 mandatory special assessment per felony count of conviction which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class C felony.

2

**6. Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

      a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

      b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

      c. in addition to a sentence of imprisonment, the Court may impose a term of supervised release for any term of years or life pursuant to 18 U.S.C. § 3583(j); and the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

      d. if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to 2 years without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed any term of years or life;

      e. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

      f. any sentence of imprisonment imposed by the Court will not allow for parole;

      g. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

      h. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

**7. Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against defendant for any federal criminal

3

offenses related to the defendant's attempted provision of material support or resources to terrorist or a designated foreign terrorist organization for which it has venue and which arose out of the defendant's conduct described above. Additionally, the United States Attorney for the Western District of Missouri agrees to dismiss Count One at sentencing.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

**8. Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and

4

conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

**9. Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

**10. Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

    a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

5

b. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2M5.3, which provides for a base offense level of 26;

c. Pursuant to U.S.S.G. § 2M5.3(b)(1)(E), there is a 2-level enhancement because the because the defendant provided material support or resources with the intent, knowledge, or reason to believe the resources were to be used to commit or assist in the commission of a violent act;

d. Pursuant to U.S.S.G. § 3A1.4(a), there is a 12-level enhancement because the offense of conviction is a felony that involved, or was intended to promote, a federal crime of terrorism;

e. The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a three-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines. The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

f Pursuant to U.S.S.G. § 3A1.4(b), the defendant's criminal history category shall be VI;

g. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

h. The United States anticipates recommending a sentence of 240 months' imprisonment at the time of sentencing. The defendant agrees not to seek or otherwise recommend a sentence below 180 months' imprisonment. These agreements by the parties are not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable";

6

i. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay;

j. The defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

**11. Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

**12. Change in Guidelines Prior to Sentencing.** The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

**13. Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

7

a.  oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

b.  comment on the evidence supporting the charges in the indictment;

c.  oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

d.  oppose any post-conviction motions for reduction of sentence, or other relief.

**14.  Waiver of Constitutional Rights.**  The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

a.  the right to plead not guilty and to persist in a plea of not guilty;

b.  the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

c.  the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

d.  the right to confront and cross-examine the witnesses who testify against him;

e.  the right to compel or subpoena witnesses to appear on his behalf; and

f.  the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial.  The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement.  The defendant

8

also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

### 15. **Waiver of Appellate and Post-Conviction Rights.**

a. The defendant acknowledges, understands and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

b. The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

### 16. **Financial Obligations.** By entering into this plea agreement, the defendant

represents that he understands and agrees to the following financial obligations:

a. The Court may order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the indictment which are to be dismissed and all other uncharged related criminal activity.

b. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

c. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

9

d. Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility.

e. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution.

f. The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

g. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $100 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

h. The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

i. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

10

17. **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive, or to authorize any third party to request or receive, from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

18. **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

19. **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States

11

Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

**20. Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter his plea of guilty.

**21. No Undisclosed Terms.** The United States and defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

**22. Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any

12

drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

Timothy A. Garrison
United States Attorney

Dated: 9/23/19

Brian P. Casey
David Raskin
Assistant United States Attorneys

I have consulted with my attorney and fully understand all of my rights with respect to the offenses charged in the indictment. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 9-23-19

Robert Lorenzo Hester, Jr.
Defendant

I am the attorney for defendant Robert Lorenzo Hester, Jr. I have fully explained to him his rights with respect to the offenses charged in the indictment. Further, I have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, the defendant's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 9-23-19

Troy K. Stabenow
Attorney for Defendant

13

## ATTACHMENT A

### OVERVIEW

1.     ROBERT LORENZO HESTER, JR., a/k/a "Mohammed Junaid Al Amreeki," a/k/a "Junaid Muhammad," a/k/a "Rabbani Junaid Muhammad," a/k/a "Rami Talib," a/k/a "Ali Talib Muhammad," posted a variety of material on multiple social media accounts. The FBI was made aware of those postings, which indicated that HESTER had converted to Islam, expressed animus toward the United States, and posted photos of weapons and the ISIS flag, among other material, suggesting an adherence to radical Islamic ideology and a propensity for violence. In order to assess whether HESTER posed a security threat, the FBI undertook a series of investigative steps, beginning with an examination of whether and to what extent HESTER would engage directly online with confidential sources working for the FBI and, later, with FBI employees working in an undercover capacity.

2.     HESTER did engage online with these undercover personnel and based on the substance of HESTER's statements in those conversations, the FBI was unable to discount HESTER as a potential security threat. HESTER said, for example, that the U.S. government should be "overthrown," and he suggested "hitting" the government "hard," while noting that it would not be "a one man job." HESTER identified categories of potential targets for attack, including "oil production," "military bases," "federal places," "government officials," and "Wall Street." HESTER specified that "[a]ny government building in DC would get attention of everyone." He said he wanted a "global jihad." Citing his brief enlistment in the U.S. Army, HESTER also claimed proficiency with "assault weapons" and said that his favorite firearm was the AK-47 rifle. HESTER spoke about the perceived ease in which one could gain access to a military base.

3.     HESTER thereafter established an apparent willingness to act on the statements that he made online.     An undercover FBI employee conversing online with HESTER offered HESTER an in- person meeting with a like-minded "brother." HESTER agreed to meet and subsequently did meet on numerous occasions with a person who was described as, and HESTER believed was, a terrorist operative – but who, in reality, was an employee of the FBI working in an undercover capacity. In the meetings, the FBI undercover made clear to HESTER that the undercover was representing a foreign terrorist organization (ISIS) and that the undercover was planning an attack that would involve multiple operatives, deploy bombs and guns, and result in mass casualties. HESTER indicated through his statements and actions that he was ready and willing to participate and assist in the "plot." For example, he obtained, at the undercover's request, items that he was told would be used as bomb components, including boxes of roofing nails. The undercover made clear to HESTER that the nails' purpose was to maximize the number of casualties. In addition, HESTER did not hesitate when the undercover showed him a cache of three machine guns and two handguns that would be used in the "attack," and two pipes that would be used to construct the "bombs." In fact, in the days after seeing this display, which was arrayed in the rear compartment of the undercover's SUV, HESTER provided information on storage units that could be used to hold the weapons and agreed to obtain additional supplies for the operation.

4.     Throughout the investigation, HESTER expressed his interest in and exhibited his willingness to commit violence in support of a foreign terrorist organization. The facts, as described in more detail below, establish that HESTER attempted to provide material support to ISIS by assisting in what he believed would be a murderous terrorist bombing and gunfire attack committed in the name of the foreign terrorist organization.

## THE DESIGNATED FOREIGN TERRORIST ORGANIZATION

5.     On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the ISIL listing: The Islamic State of Iraq and al-Sham (ISIS), The Islamic State of Iraq and Syria (ISIS), ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al- Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

## HESTER'S BACKGROUND AND SOCIAL MEDIA POSTINGS

6.     HESTER is a U.S. citizen who was born and currently resides in Missouri. In late 2012, he enlisted in the U.S. Army. HESTER completed basic training, which included standard training with firearms and small-unit combat tactics. During Advanced Individual Training, HESTER was cited for numerous violations of U.S. Army regulations. In mid-2013, HESTER received a general discharge from service.

7.     The FBI became aware of HESTER in or about August 2016 based on reports from multiple confidential sources who had observed public posts initiated by HESTER, under the alias "Rabbani Junaid Muhammad," on a popular social media platform (the "social media platform"). The source reports reflected statements by HESTER concerning his conversion to Islam, his hatred for the United States and his belief that supposed U.S. mistreatment of Muslims had to be "put to an end." The reports also noted that HESTER had posted numerous photographs of automatic weapons and ammunition, including one photograph of a handgun and a knife next to the Quran. The reports also indicated that, on August 14, 2016, HESTER selected as a profile picture for two of his accounts on the social media platform an image of the Black Flag of Tawhid. ISIS has co-opted the Black Flag of Tawhid as its flag and the flag has regularly been featured in ISIS propaganda videos.

8.     In September 2016, the FBI undertook a review of HESTER's publicly available posts on the social media platform. That review revealed a profile description, "Zionist Jew Pig Redneck Hunting Super Assassin," and the following posts, among others:

2

a. A post on or about July 4, 2016, under the alias "Rami Talib," stating: "Isis created by U.S. And Israeli government. A true Muslim would never commit suicide bombing during Ramadan at the Prophets (pbuh) masjid";

b. Posts on or about August 16, 2016, under the alias "Junaid Muhammad," stating, "Burn in hell FBI," and referring to a certain encrypted messaging application as "no longer safe";

c. A post on or about September 30, 2016, under the alias "Ali Talib Muhammad," stating: "Brothers in AmurdiKKKa we need to get something going here all those rednecks have their little militias why shouldn't we do the same";

d. Two other posts on or about September 30, 2016, under the alias "Ali Talib Muhammad," referred to a group called "The Lion Guard": "Look Out Here Comes The Lion Guard" and "Join the Lion Guard." In response to a comment on the social media platform, HESTER explained: "It started as a cartoon my children watch but i would like to take in a new direction a group of lions to guard the ummah." "Ummah" is an Arabic word meaning the entire Muslim community. Some Islamic extremists, including ISIS supporters, like to refer to themselves as lions, and use references and images of lions to identify themselves as jihadists;

e. A post on or about October 1, 2016, under the alias "Ali Talib Muhammad," stating: "I want to get a movement going here in Amurdikkka we need people to come together though to make things happen"; and

f. Another post on or about October 1, 2016, under the alias "Ali Talib Muhammad," stating in the form of a caption to a photograph of a fully loaded magazine: "Won't be any clowning around my home."

## HESTER'S LOCAL ARREST

9. On or about October 3, 2016, HESTER was arrested by the Columbia, Missouri, Police Department after an incident in the parking lot of a grocery store. HESTER was in the store's parking lot and appeared to be in an argument with his wife. Hester then threw a folded pocket knife through a plate-glass window near the entrance of the store. When store employees confronted HESTER, he assumed an aggressive stance, forcefully placed his hand into the diaper bag he was carrying, in a manner that appeared to be reaching for a weapon, and yelled that he did not want "any of this" and that he would "fucking do it." Columbia police later recovered a 9-millimeter handgun from the diaper bag. The handgun resembled the handgun that HESTER posted pictures of on the social media platform.

10. HESTER was charged in state court with a felony count of property damage, a felony count of unlawful use of a weapon, and a misdemeanor count of assault. HESTER remained in custody until on or about October 13, 2016, when he was released on bond. His bond conditions included electronic monitoring.

11. On or about January 17, 2017, a warrant was issued for HESTER's arrest for a violation of his bond conditions, which was a positive urinalysis for marijuana. On or about January 24, 2017, HESTER pleaded guilty to one count of felony property damage and one count of unlawful use of a weapon and was released on his own recognizance pending a sentencing hearing that was scheduled for March 2017. HESTER was no longer on electronic monitoring after that date.

## HESTER'S STATEMENTS TO UC-1

12. On or about October 2, 2016, the day before HESTER's arrest, an FBI employee using an undercover identity (UC-1) accepted a friend request on the social media platform from HESTER, who was using the alias "Ali Talib Muhammad." The FBI tasked UC-1 to learn more about "The Lion Guard" by contacting HESTER via the private messaging function on the social media platform. On October 15, 2016, two days after HESTER was released from pretrial detention, UC-1 contacted HESTER by private message, stating that UC-1 liked HESTER's idea about "The Lion Guard" (referred to above) and asking whether HESTER had made any progress. HESTER responded that he had not made progress, noting his recent arrest, but added that he was "serious about the guard." HESTER explained that "we just need some more brothers and sisters on the same page as you and i it can be done with patience and dedication."

13. On October 16, 2016, HESTER shared a post on the social media platform that contained a news article about recent U.S. bombings in Yemen, which HESTER described in a post as "USA terrorism." When UC-1 contacted HESTER via the private messaging function on the social media platform, HESTER observed that "america is about to get rough." UC-1 explained why it was "already rough" and asked HESTER whether it could get any rougher. HESTER opined that the country would not "last much longer." HESTER said that the U.S. government should be overthrown, that "hitting govt hard" was a starting point, but that it was "not a one man job." UC-1 agreed and asked whether HESTER had a plan or needed help, noting that UC-1 had recently met "with some brothers" who were talking about the same thing. HESTER said that he was "looking into it now" and that he "would like talk with these people" to "come up with some serious ideas." In response to UC-1's suggestion that they talk further, HESTER stated: "We need to find a secure means of communication first. We will need brothers all over the place." HESTER said he would find out more about secure communications, including a particular encrypted messaging application (the "encrypted messaging app").

14. On October 17, 2016, HESTER and UC-1 engaged in another discussion, which began on the social media platform and then moved to the encrypted messaging app. In the portion of the discussion on the social media platform, UC-1 again asked HESTER about his plan, to which HESTER responded: "We need to hit hard where it counts i was thinking oil production and federal places." HESTER continued: "Government officials also need to be taken care of but we must hurt the economy." HESTER added that "it can be done but we need some big help." HESTER reiterated his desire for "encrypted communication," stated that they should use the encrypted messaging app, and he set up an account while conversing with UC-1. When their discussion resumed on the encrypted messaging app, HESTER noted that this was a

4

"[m]uch safer" means of communication than the social media platform. UC-1 raised the subject of firearms, suggesting that he might send HESTER a photograph of two AK-47 rifles that "the brothers" had moved for someone. HESTER responded: "Aks are my favorite weapon."

15. On October 18, 2016, HESTER and UC-1 communicated again over the encrypted messaging app, a conversation that began with UC-1 sending to HESTER the previously mentioned photograph of the AK-47 rifles. HESTER said he wanted one of the rifles and that he would "love to shoot the kufr with [it]." "Kufr" (or "kuffar") is an Arabic term that means "non-believers" or "infidels," and in this context, the Government believed HESTER was referring generally to Americans. HESTER stated: "I want to actually make a difference and change this entire world a global jihad." HESTER reiterated that he was trying to find like-minded people to help.

16. On October 19, 2016, HESTER and UC-1 communicated again via the encrypted messaging app. HESTER began the conversation by stating that "[o]il production has to be shut down to control the governments movements." UC-1 asked HESTER whether there was an oil pipeline near him, to which HESTER said he would find out by researching. (For security purposes, UC-1 also confirmed during this conversation that HESTER was not in possession of a firearm, a gun having been confiscated from HESTER in connection with the October 3 local arrest.) Toward the end of the discussion, UC-1 referred again to the "brothers" with whom UC-1 associated, explaining that they traveled to mosques around the country to meet with other brothers. HESTER said he would like such a meeting.

17. HESTER and UC-1 maintained regular contact via the encrypted messaging app, as well by exchanging text messages on October 29, 2016 and October 30, 2016, on the subject of potential targets for their attacks. On October 29, HESTER said that after checking on oil production he found that there was an oil plant in Missouri. UC-1 said that the "brothers" liked HESTER's idea of "messing with the economy." HESTER's response was that Texas was "the biggest state for oil production" but that he was "looking into headquarters for oil production and CEO names etc," presumably those located in Missouri. On October 30, HESTER said that the oil companies in Missouri were "small scale" and when UC-1 asked whether Missouri had "anything else," HESTER said there were military bases, which he noted were easy to access as "long as [you] have state ID." HESTER also suggested "Washington DC" and "Wall Street," without naming any particular targets. HESTER added that "[a]ny government building in DC would get attention of everyone." Regarding targeting a military base, HESTER noted his prior military service to reveal that he was "trained really well with assault weapons." UC-1 reminded HESTER about the "brothers" who travel around the country and said that one of them would be in the area "in a couple of weeks" and would like to meet HESTER. HESTER did not respond and the conversation ended.

18. On the next day, October 31, 2016, HESTER initiated a text message conversation with UC-1. HESTER started by apologizing for abruptly ending the previous day's discussion and stating that he "would love to meet with the brother." HESTER continued to talk about accessing military bases, identifying a Missouri base by name. At the conclusion of the text message conversation, HESTER sent UC-1 a link on the encrypted messaging app to a

5

particular channel, which was an invitation-only channel that was pro-ISIS and provided updates on fighting in Iraq, Syria and elsewhere.

## HESTER'S FIRST MEETING WITH UC-2

19.     On November 3, 2016, UC-1 told HESTER via the encrypted messaging app that "one of the brothers" UC-1 had previously mentioned would be in Missouri next week and able to meet with HESTER. This "brother" was another FBI employee working in an undercover capacity and will be referred to herein as UC-2. HESTER suggested that UC-1 give UC-2 HESTER's telephone number. On November 7, 2016, UC-1 told HESTER via the encrypted messaging app that UC-2 was able to meet with HESTER the next day and UC-1 and HESTER worked through the logistics of how UC-2 and HESTER would meet.

20.     On November 8, 2016, HESTER met with UC-2. The meeting, which lasted about 30 minutes, took place in UC-2's vehicle, while it was parked outside of HESTER's residence in Columbia, Missouri. The meeting was audio and video recorded, as were HESTER's subsequent meetings with UC-2. For this first meeting, HESTER brought his two young children, which HESTER explained could not be avoided, given his child care responsibilities that day. During the meeting, HESTER and UC-2 discussed a broad range of topics, including their respective backgrounds, employment, race and religion. The discussion also included the following:

a.     UC-2 began the conversation by explaining that UC-2 was visiting HESTER at the request of a "brother" but that UC-2 was unaware of the purpose of the visit. UC-2 said he did not know HESTER and was not sure what HESTER was looking for. UC-2 explained that UC-2 could not "be too careful" and HESTER said he understood.

b.     HESTER said, "I don't like America, like for my kids." UC-2 explored the basis for this view, which led to a discussion about Islam. HESTER explained that he was still learning the religion and was often confused by what he heard from "brothers" online. UC-2 asked if HESTER was "looking for an Islamic state." HESTER said "yes." HESTER said he wanted to move, but his familial circumstances prevented it. HESTER was not satisfied with the teachings at the local mosque, which he found to be "[v]ery moderate and very watered down." HESTER said he believed that "Sharia is the only law" that should matter.

c.     UC-2 said he would contact HESTER again, but through the other "brother" (meaning UC-1), because even though HESTER seemed like a "good brother," in UC-2's view, UC-2 still did not know HESTER very well. HESTER said he understood, noting for emphasis that he "grew up in the hood, man." The Government believed that HESTER added the reference to his upbringing to convey his awareness that UC-2 was vetting him for participation in an illicit endeavor.

d.     After goodbyes were exchanged, and right before HESTER left the vehicle, he said: "I want to do something for all the kids, . . . this entire generation of

6

Muslim children," adding that "they need to be able to respect it as Muslims, as people, as human beings."

21. Later on November 8, 2016, after his meeting with UC-2, HESTER reached out to UC-1 on the encrypted messaging app and said: "I like the brother he is very smart." HESTER thanked UC-1 for "vouching" for HESTER.

## HESTER'S NEXT TWO MEETINGS WITH UC-2

22. HESTER and UC-1 maintained regular contact. On November 28, 2016, HESTER inquired whether UC-1 had "heard from" UC-2. UC-1 said he would check, and shortly thereafter, told HESTER that UC-2 was going to be in town over the next several days and would be able to see HESTER. HESTER said that was "great news."

23. On November 30, 2016, UC-2 met HESTER at HESTER's place of business and gave HESTER a ride home. Their conversation, the majority of which took place in UC-2's vehicle, lasted about 30 minutes and touched on a number of subjects, including more on HESTER's background, the reasons he converted to Islam, and his desire to learn more about the religion. The discussion also included the following:

 a. UC-2 provided HESTER with $100, stating that in light of the things HESTER said he was going through during their first meeting "this is one job that one brother is supposed to do to another," and "it's my duty to make sure that the brother is okay."

 b. Throughout the conversation, HESTER repeatedly denied smoking marijuana. Smoking is forbidden under Islamic law and custom; and as noted above, on or about January 17, 2017, a urinalysis in connection with HESTER's state case was positive for marijuana.

 c. UC-2 explained to HESTER that UC-2's job to was make sure "that you are who you are," meaning to assess whether UC-2 could vouch for HESTER with the "brothers." HESTER understood that their conversation would end if UC-2 could not verify his sincerity. UC-2 told HESTER that they would meet again the next day and UC-2 said that at that time UC-2 would "see if you are who you really are." HESTER expressed his appreciation for UC-2 taking time to meet with him, and agreed to meet the next day.

24. On December 1, 2016, HESTER reached out to UC-1 via the encrypted messaging app and said that he felt good after talking to UC-2 the previous day. Later that day, UC-2 picked up HESTER at work and drove HESTER home. During the meeting HESTER and UC-2 discussed the following:

 a. UC-2 asked HESTER to explain, for the first time, what HESTER had discussed with UC-1. HESTER said that instead of "three or four guys . . . shootin' up somewhere," he wanted to do "things that could actually make a difference like

7

doing something to the economy and stuff, things to hurt the economy." HESTER said that "instead of fighting hand to hand combat," he "was thinking about oil lines, hitting oil pipelines and oil markets." HESTER also suggested hurting the economy by getting into "computer systems and stuff.

      b.     UC-2 repeatedly told HESTER that he could disassociate himself from the operation at this time because "this is real." But as they sat in the vehicle parked in front of HESTER's home, UC-2 cautioned that once HESTER committed himself, there would be "no turning back." HESTER confirmed that he understood, left the vehicle to take items into the residence, but returned to continue the conversation. After thoroughly explaining to HESTER that it was acceptable for him to decide to take care of his family rather than be involved in the operation, HESTER said, "I'm in." HESTER explained, "I wanna help the brothers and sisters anyway I can," which included "fighting skills," helping "spread the word," and training others on "everything I was taught in the Army," such as "[e]verything about weapons," and "how they move."

      c.     During the conversation, HESTER stated that he has never killed another person, but described two instances in which he fired gunshots at other persons. To date, the investigation has not yielded any information to confirm the veracity of these statements.

      d.     UC-2 asked HESTER if he was "willing to make that sacrifice." HESTER responded: "I can't say yes like I'm ready to die because I don't know where I sit with Allah right now." When asked whether he was willing to leave his family if he could receive safe passage to travel to fight, HESTER stated, "Yes," because the risk of death was no different than when he joined the army.

      e.     Before the conclusion of the meeting, UC-2 reiterated that HESTER could be part of the operation or could disassociate himself from it. At the same time, for security reasons, UC-2 was adamant that HESTER did not have a third option to engage in any sort of violence on his own or participate in some other operation of which UC-2 was unaware. UC-2 insisted that HESTER promise that he would engage in no such thing and UC-2 threatened to come back and find HESTER if he learned that HESTER reneged on the promise. For emphasis, and for the purpose of mitigating the security threat posed by HESTER, UC-2 displayed a knife and reminded HESTER that UC-2 knew where HESTER and his family lived, among other forceful words.

    25.     On December 6, 2016, HESTER had a conversation with UC-1 via the encrypted messaging app, in which HESTER complained about UC-2's forceful commentary at the end of the December 1 meeting. HESTER explained to UC-1 that UC-2 had threatened to harm HESTER and his family if HESTER "talked about any plans" or "planned without letting him [UC-2] know." HESTER said he was not scared, but that it was wrong for UC-2 to threaten his family and that HESTER did not "like being treated like a snitch." HESTER asked UC-1 not to raise the matter with UC-2 because HESTER did not "want to have to kill someone for running up on [HESTER's] family."

## HESTER'S LATE DECEMBER MEETINGS WITH UC-2

26. Notwithstanding his complaints about UC-2, HESTER met with UC-2 twice in late December 2016. On December 20, 2016, UC-2 picked up HESTER at work and drove him home. During the meeting, HESTER and UC-2 discussed the following:

   a. UC-2 stated that UC-1 had confirmed that HESTER had stayed off of social media as instructed, which was a reference to the type of proactive steps that UC-2 had warned against in their last meeting. UC-2 explained to HESTER that those instructions were a test. HESTER said he did not know that, but that he was nervous about law enforcement anyway.

   b. HESTER stated that there were persons that contacted him on social media that "could've been feds" because of the questions they asked. HESTER did not think that either UC-1 or UC-2 were like that, but he had cut people out of his life because he was not trying to "go to the penitentiary right now."

   c. UC-2 reiterated that HESTER was not to do anything without letting UC-2 know to avoid messing up what was planned because it involved a "big network" and would take time, which HESTER understood and was "comfortable with."

   d. At the end of the conversation, UC-2 provided HESTER with a "clean phone" to use, stating that UC-2 would provide HESTER with minutes for the phone the next time they met.

27. December 21, 2016, UC-2 again picked up HESTER at work and drove him home. During the meeting, HESTER and UC-2 discussed the following:

   a. UC-2 began by stating that UC-2 was telling "the brothers" about HESTER, when HESTER said that he could not wait to be off of electronic monitoring. UC-2 stated that the told the "brothers" that HESTER would hopefully be off monitoring soon, and told HESTER that UC-2 "just wanted to remind" him that "the Islamic State is coming."

   b. UC-2 gave HESTER cards containing minutes to use on the phone UC-2 provided the day before. UC-2 stated that the minutes should last until he returned around the end of January, when HESTER expected to be off of electronic monitoring.

   c. HESTER stated that his car broke down after someone pointed a gun at HESTER and HESTER shot at the other car. HESTER believes that the other car must have shot back at him and disabled his car because it has not worked since that incident. To date, the investigation has not yielded any information to confirm the veracity of this statement.

   d. HESTER and UC-2 discussed HESTER's desire to leave Missouri and HESTER's ability to leave his mark on Missouri when he does. UC-2 told HESTER, "Just

9

know you got the brothers from the Islamic State supporting you now," to which HESTER expressed his appreciation. UC-2 stated that if HESTER was ready to leave Missouri, "we'll leave with something to remember." HESTER said, "Okay, that sounds like a plan."

## HESTER'S NEXT TWO MEETINGS WITH UC-2

28.     As noted above in connection with HESTER's state criminal case, he was taken off electronic monitoring on January 24, 2017. In an exchange of text messages on January 28, 2017, HESTER told UC-1 that he and his family were thinking of moving, with St. Louis and Houston being destinations they considered. The next day, January 29, 2016, UC-1 told HESTER via text message that UC-2 would be in Missouri next week and wanted to meet with HESTER. HESTER said he was looking forward to the meeting.

29.     On January 31, 2017, UC-2 met with HESTER in UC-2's vehicle while it was parked outside of HESTER's residence. Their discussion, which was brief, included the following statements:

a.     HESTER told UC-2 that he was off of electronic monitoring, but had gone back to jail because he "got pulled over with somebody and they had weed in the car with 'em." HESTER later described how the car had been pulled over because of tinted windows. Based on the investigation, the Government believed both statements were false.

b.     HESTER stated that he broke the phone UC-2 had given him, because he was scared and did not want anyone to get it. UC-2 commended HESTER, saying that he "did good" and that it showed that HESTER was thinking because "it's not just about you." UC-2 told HESTER that the "brothers" were moving ahead with plans and that HESTER's discarding of the phone was appreciated as "a small gesture [that] goes a long way in the next step."

c.     UC-2 provided HESTER a list of items for HESTER to purchase and stated that he needed the list back from HESTER the next day. The list, which was written on a paper napkin, included 9-volt batteries, duct tape, copper wire, and roofing nails. HESTER stated that he would purchase the items but that he did not have the money to do it that night. After UC-2 confirmed that HESTER could not get the money, UC-2 provided HESTER with $20 to purchase the items, which HESTER agreed to repay when he could. UC-2 implied that the items would be used to make bombs, stating that those materials are needed "to make . . . things . . . to bring some kind of destruction." HESTER responded by stating: "I'm just ready to help. I'm ready to help any way I can."

d.     When UC-2 stated what they are planning is "going to bring them to their knees . . . and then they gonna know to fear Allah," HESTER expressed his anticipation by stating: "I can't wait. I can't wait."

10

e.    UC-2 and HESTER agreed that when UC-2 arrived at HESTER's home the next day, HESTER would open his garage door so UC-2 could back into the garage, because UC-2 would have something to show HESTER.

30.    Later that day, HESTER told UC-1 via text message that he was "going shopping in the morning." The next morning, February 1, 2017, HESTER purchased 9-volt batteries, duct tape, and two boxes of roofing nails. HESTER purchased the items from a retail store whose business was international in scope. A surveillance video obtained from the store depicted HESTER making the purchase. Thereafter, HESTER told UC-1 via text message that he had purchased all but one of the items, noting that he could not find "wires for the fence."

31.    Later on February 1, 2017, HESTER met UC-2 at his residence. Prior to the meeting, the FBI loaded various items into the rear compartment of the SUV UC-2 would be driving to the meeting. The items included three AK-47 style rifles and two .45 caliber handguns, all of which had been rendered incapable of discharge. The items also included a backpack containing two pieces of pipe (one metal, one plastic) with end caps attached in the manner of pipe bombs, along with some cord-like safety fuse. When UC-2 arrived at HESTER's home, UC-2 backed the vehicle toward HESTER's garage and HESTER opened the lift gate, as previously agreed. While standing at the back of the vehicle, UC-2 and HESTER discussed the following:

a.    HESTER provided UC-2 with a bag containing the 9-volt batteries, duct tape, and roofing nails he purchased earlier that day. UC-2 asked for the list provided to HESTER the day before and the receipt for the items. HESTER did not have the receipt, but provided UC-2 the list, explaining that he spent $22 but could not find the copper wire. UC-2 made it appear to HESTER as if UC-2 had burned the list; in response, HESTER stated "I was gonna do that." (The actual list was preserved as evidence.)

b.    UC-2 told HESTER that before showing HESTER the surprise UC-2 brought for him, HESTER needed to understand what was about to happen. UC-2 told HESTER that buying the items and returning the list was another test and UC-2 liked how HESTER handled things so far. UC-2 told HESTER that they were planning something "ten times more" than the Boston Marathon bombing, and HESTER expressed his approval.

c.    UC-2 told HESTER that there were various "kufr" holidays coming up and they were planning on "killing a lot of people," and HESTER expressed his approval.

d.    UC-2 told HESTER that the Boston Marathon bombers were caught because they were working alone, but that UC-2 was working with ISIS and that what UC-2 was working on was coordinated. HESTER acknowledged that he understood this and UC-2 stated "[s]o all ISIL warriors that we have here with us . . . welcome, brother." HESTER expressed his approval.

11

e.        UC-2 told HESTER that if HESTER was "not down" or not "willin' to handle this," then HESTER could "walk away." HESTER said, "I'm down." UC-2 said they were going to "wage all kinda war," and HESTER again expressed his approval.

f.        At this point in the conversation, UC-2 pulled back blankets that were covering the items in the back of the SUV, exposing the three AK-47 style rifles and two .45 caliber handguns. HESTER recognized what the firearms were and stated, "[t]hat's my kind of expertise there." HESTER explained that while he had shot an "AK," he did not know how to break one down, adding that he could do both with an M-16 because of his military service. HESTER also stated he used to own a .45.

g.        UC-2 stated that while they had plenty of firearms, they needed more ammunition, and HESTER stated that he could not purchase ammunition because of his present state charges but that he had a friend that could get ammunition for him. HESTER stated that he would have money to purchase ammunition after he received his tax refund and after he was paid in a couple of weeks.

h.        UC-2 opened the backpack, which contained the pipes and fuse, stating that "these are bombs right here." UC-2 explained that the duct tape HESTER provided would be used to tape the bombs together, which HESTER acknowledged. UC-2 stated that they had more backpacks that they were going to put in different locations, being careful not to be caught on cameras. HESTER acknowledged that he understood.

i.        HESTER stated that they had to be smarter than the Boston Marathon bombers, and stated that he remembered all of his military training, including how to clear a room or building, how to use weapons, and military movements.

j.        HESTER again confirmed that he was "down" and that he understood that they had to "lay low" and act in a manner to avoid detection.

k.        UC-2 stated that the nails HESTER provided would "cut peoples head's off," and HESTER responded, "Oh yes. Oh yeah. I know," indicating that HESTER understood that the nails were to be used as shrapnel for bombs. UC-2 stated: "You cuttin' peoples' heads off. We . . . gonna leave a force of reckonin' on them so so brutal that they gonna, they ain't gonna have time to recuperate or be lookin' like know what happening, like oh, man, we gotta back up on all you brothers," to which HESTER expressed his approval.

l.        UC-2 stated that they were going to "strike fear in all these infidel hearts," and HESTER responded that he agreed and that he was ready.

### HESTER'S FURTHER STATEMENTS TO UC-1

32.        On or about February 2, 2017, HESTER sent UC-1 the following text messages: "I should have some more stuff for the brother in a couple of weeks when I get paid"; "I will

12

help anyway I can . . . if not us who will"; and "When you talk to the brother again let him know I'll have some more gifts in a couple of weeks."

33.     On February 4, 2017, HESTER and UC-1 had a conversation via the encrypted messaging app, at UC-1's request. UC-1 asked HESTER if he would find the addresses for storage units in the Columbia area, directing HESTER's attention to "what the brother showed [him.]" HESTER agreed to find the addresses and, with respect to what he was shown, HESTER said: "I was like a kid in candy store when I seen lol."

34.     On February 6, 2017, HESTER reported back to UC-1 via the encrypted messaging app. HESTER provided UC-1 with names and addresses for five local storage facilities. When UC-1 said that the "brothers" were concerned about video surveillance at the facilities, HESTER reported that he was "seeing a lot of these [facilities] have cameras" and that he was to determine precise locations of the cameras.

35.     On February 7, 2017, HESTER and UC-1 again communicated over the encrypted messaging app. After an exchange of greetings, HESTER asked how the "party plans" were progressing and offered to help in any way. Shortly thereafter, UC-1 opined: "Once this is over and the kafir are counting their dead They will know that the Islamic State Caliphate has spread into the United States." HESTER said he was excited, that he was "happy to be part" of it, and that it was "time they answer for their atrocities." HESTER predicted that it was "going to be a good day for Muslims worldwide."

36.     On February 11, 2017, HESTER contacted UC-1 via the encrypted messaging app and asked how the "party plan" was coming along. In discussing the planned operation, HESTER said that he would try to get more "supplies."

37.     On February 16, 2017, HESTER and UC-1 had another conversation over the encrypted messaging app. UC-1 told HESTER that the "party" would take place on Presidents' Day (that is, February 20, 2017) and that the targets of the operation would include buses, trains and a train station in Kansas City, Missouri. HESTER expressed approval and asked UC-1 whether particular "supplies" were needed. UC-1 said they needed shrapnel, mentioning nails and screws as examples. HESTER said he would "pick some things up" and added that it felt "good to help strike back at the true terrorist."

### HESTER'S FEBRUARY 17 MEETING WITH UC-2

38.     On February 17, 2017, UC-1 advised HESTER that UC-2 was in town and ready to meet and HESTER agreed to meet UC-2. UC-2 met HESTER in front of HESTER's residence and HESTER joined UC-2 in the front seat of UC-2's vehicle. HESTER had with him a plastic bag, which was later determined to contain two boxes of roofing nails, among other items. UC-2 and HESTER drove to a nearby storage facility, which was one of the facilities HESTER previously identified in his communications with UC-1. Upon arrival at the storage facility, HESTER and UC-2 briefly conducted surveillance and discussed the location of the facility's security cameras. Shortly thereafter, HESTER was arrested.

13