IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 17-00064-01-CR-W-DGK |
| | ) | |
| ROBERT LORENZO HESTER, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM

COMES NOW defendant, Robert Lorenzo Hester, Jr., by counsel, Troy Stabenow, and submits this Sentencing Memorandum in support of a sentence of 15 years' confinement.

## SUGGESTIONS IN SUPPORT

### I.      Robert Hester's Background

Robert Hester was born to an interracial, unmarried couple of drug users.[1] Robert's father physically and mentally abused both Robert and his mother.[2]   His mother suffered from bipolar disorder.[3]   While Robert was still a child, his father left, then both of Robert's parents were separately sent to prison, leaving Robert without either parent, in the care of relatives.[4]   Due to his mixed race and his parents' crimes, Robert Hester

---

[1] PSIR at Paragraph 57.
[2] Id. at 57, 58.
[3] Id.
[4] Id.

was relentlessly mocked and ostracized by peers of both races.

Robert struggled to deal with the instability in his life. Robert did not have adults modeling appropriate coping mechanisms; instead the adults around him used violence, drugs, and alcohol to handle their emotions.[5] Robert was largely left to struggle with the PTSD related issues of his abusive childhood on his own. The anxiety he felt about being harmed and then abandoned manifested as anger-related outbursts in school.[6] Following the lead of his parents' and his family members, Robert tried to handle his ongoing anxiety and anger with controlled substances. He regularly used alcohol by age 12, regularly used marijuana by age 13, and began abusing painkillers and harder drugs by age 15.[7]

Throughout all of his struggles, Robert Hester desperately wanted to feel accepted and to do something that would make someone proud of him. He struggled in school, but he earned his diploma.[8] He then married a young woman and tried to identify a way he could earn everyone's respect. He fulfilled a dream by enlisting in the Army to become a medic.[9] As this Court will hear at sentencing, Robert Hester felt like he was finally going to be accepted by society. He thought he had finally found a brotherhood with whom he would feel welcomed, and with whom he could make a difference in service of his family.

---

[5] PSIR at Paragraphs 65-68.
[6] Id.
[7] Id at 69 through 74.
[8] Id. at 76.
[9] Id. at 74, 75.

Shortly into his training, Robert Hester's hopes ran into reality. He found himself regularly subjected to mockery and ridicule by his fellow trainees for both his lack of intellect and his mixed-race heritage. He struggled to handle the criticism, but despite his best efforts, he was simply not able to learn at the pace required by the trainers. He felt increasingly despondent and resorted to alcohol use.[10] Although he was then given some alcohol counseling, the larger underlying issues were not treated. Ultimately Robert Hester got into a scuffle with a fellow trainee after he was mocked before his peers. Given his lack of aptitude, and his alcohol use, he was discharged from the Army with a General under Honorable Circumstances discharge. Robert never even completed training or received a unit assignment.[11]

Robert Hester returned to Columbia a disheartened young man. He fell into more regular drug and alcohol use. He had no marketable skills. As this Court will hear at sentencing, Mr. Hester now sees that he was simply not mature enough, or sober enough, to accept responsibility for his failure. At the time however, he lacked the sobriety or self-awareness necessary to assess his behavior. He instead felt emotionally betrayed by the Army and struggled to handle the humiliation he received in his home community for "flunking out" of the military.

The only positive support Robert received was from his wife, his mother, and from

---

[10] Id. at 75.
[11] Id. at 75. While this level of discharge entitles the Soldier to limited benefits, it is the military equivalent of being released during a probationary term of employment.

several young men who suggested that Islam was a religion that valued men like him. Robert began to listen to discussions about Islam and "reverted" to the religion.

Just as when he joined the military, Robert Hester desperately wanted to fit in and do the "right" thing. He felt like he had to earn/prove his worth to those around him. He felt that others would question his identity and loyalty to his new faith. In an effort to fit in, he searched online to learn how to be a good, new Muslim.

Robert Hester quickly ran into targeted propaganda that was aimed directly at young, disaffected men like himself. Robert and his young wife had started his own family. Along with teachings about how to be a Muslim, the videos he found online pushed a consistent narrative that Muslims and Africa-Americans were being victimized by the United States government. Robert was susceptible to the message of those videos. As a new father himself, he was heartbroken and infuriated when he watched carefully edited footage of western forces engaging in violence that resulted in the deaths of women and children in Iraq, Afghanistan, and elsewhere. In the videos, he was consistently told that the American military had been corrupted and that the United States government had adopted a policy of actively trying to hurt young Muslim families.

Robert expressed his anger about the violence he saw online, and began to parrot some of what he saw. For his efforts, Robert received praise and was told by other social media users that he was becoming a good son of God. As he received more praise, Robert re-posted others' stories, feeling a growing sense of acceptance. He even began to adopt a false cultural identity to match the people he online. For instance, to

demonstrate that he was trying to be a good believer, he posted a picture of himself wearing a keffiyeh (an Arab head-scarf).

It was Robert's social media posts that led the FBI to initially watch Robert Hester and evaluate his behavior. On the first day that the FBI watched him, Robert got into an angry argument outside Hy-Vee. That incident, for which he was eventually charged, was the cause of his only criminal history point, but it had the bigger effect of triggering the FBI to try and link Robert up with an in-person agent. A FBI contact messaged Robert Hester directly. As the government has detailed, Robert Hester and this contact exchanged many comments agreeing that someone should punish the United States government for what it was apparently doing to Muslim women and children, and discussing how that might happen. The contact then offered to arrange for Robert Hester to meet "a brother" who would steer him in faith and help him doing something about the mistreatment of Muslims. Robert Accepted.

The agent was initially everything Robert expected, feared, and also hoped for. Just like had happened throughout his life, the "brother" who met Robert almost immediately suggested that because of his mixed-race, Robert might be someone he couldn't respect or trust. The agent questioned Robert's faith, his character, and his lifestyle. The agent offered hope however. The agent offered to mentor Robert and walked him through different ways and actions that he could become a better Muslim and become more "right" with God. The agent also gave Robert money to buy presents for his kids.

Initially, Robert questioned some of what he was told. For instance, Robert explained that he was confused about what he was being told online. While he agreed that he wanted to "to do something for all the kids" to make sure that society would "be able to respect it as Muslim, as people, as human beings," he was initially reluctant to undertake any direct actions. For instance, when asked if he was willing to directly participate in an attack that might result in his death, Robert exhibited clear hesitation and stated "I can't say yes like I'm ready to die because I don't know where I sit with Allah right now."

The agent played the role of tough mentor very well, because the agent was everything Robert wanted to be. The agent claimed to be knowledgeable about Islam, he drove a nice vehicle, he appeared to be self-confident and respected, he offered Robert the possibility of respect and brotherhood, and he even had money to give Robert so that he could play the hero to his kids. Robert described the agent as "very smart," and welcomed his guidance on how to be a good man, a good father, and a good Muslim.

It was during one of these first meetings that the agent pulled out a knife, exhibited the open blade, and told Robert Hester that the agent and those he worked with were serious and now knew where Robert's family lived. The agent purportedly had the motive of intending to protect society while also allowing Robert more time to back-out of any real support for terrorism. That may be true, but unlike other cases of this type counsel has found, this is the only one in which a federal agent threatened the family of the defendant, and this occurred before Robert committed to any act of support.

This episode hangs over the entirety of their relationship thereafter. The videos indisputably show that Robert Hester became more and more deferential to the agent, agreeing with whatever the agent said, trying to display open support for anything suggested to him, and framing his interactions to please the agent. Robert also made-up provably false events to explain his past behavior, lied about his drug and alcohol use to avoid angering the agent or appearing to be an imperfect believer, etc. Robert agreed with anything the agent said, even when a statement directly contradicted something Robert had stated himself just moments earlier. The government fairly points out that Robert also appeared, over time, to be happy to help the agent, eager to do what he was asked, etc. However, it is impossible to parse out from the evidence what actions are attributable to Robert's sincere desire to act against those he thought were hurting Muslim children, what was related to his desire to please the agent, and what he felt obligated to do and say to keep his children safe.

What we know is that Robert did what he was told, displayed enthusiasm for anything the agent said, and did not go to the government for help. Conversely, we know that upon his seizure by agents, Robert tried to warn the FBI that the man he was with was a terrorist and that they needed to arrest him. During his ensuing interview, Robert also confessed.

Robert Hester has now been in custody for three years. As this Court will hear from Mr. Hester at sentencing, this is the first time since he was 12 that he has experienced prolonged sobriety. During these years in custody, Robert has been treated

by a psychiatrist and has been provided proscribed medications to help him deal with his anxiety and PTSD-related stress for the first time. For the first time ever, Robert feels like he is not bouncing between fear, uncertainty, and anger. He has been surrounded by, and witnessed, numerous assaults, stabbings, and acts of violence in the Leavenworth detention facility. He has also been targeted for special, negative attention because of the nature of these charges. But unlike in the past, Robert has kept his temper. He has not acted out. Robert has kept out of trouble and been a model detainee.

The reason for this change is simple. Robert has used his newfound sobriety and stabilized mood to focus on study, introspection, and learning. As this Court will hear, no one would wish to be in custody, but he wakes up each day aware of what could potentially have happened. He is continually relieved and glad that he is in custody, because of the simple fact that it means what he had gotten himself into was not real. Robert no longer accepts the propaganda he found online. He blames only himself for where he is and he is a truly contrite man. He is now focused on his weekly opportunities to speak to his kids. He hopes to learn a job skill in prison so that when he is eventually released he can offer them financial help as they move into adulthood. He also regularly expresses the hope that while in prison he will be afforded the opportunity through a prison counselor to write or record messages for other disaffected young men, offering his own life experiences as a learning lesson.

## II. Context

Robert Hester's behavior did not occur in a vacuum. Counsel has identified

similar offenses from around the country for use as comparison points. These cases help us evaluate the offense conduct in this case relative to other cases, and help us to consider the potential for rehabilitation.

### A.  United States v. Jameson[12]

During October of 2017, the FBI was also watching an online personality in California. Jameson was posting nearly identical content to that posted in this case. Jameson then identified himself as a discharged Marine to a government agent. After explaining that he had qualified as a sharpshooter, Jameson stated, "I have been trained in combat and things of war." In response to questions about what he would be willing to do to help terrorist groups, Jameson wrote back, "Tell them anything. I can suit up and take myself to our brothers. Or whatever they need done here."

Like in this case, the next step was for Mr. Jameson to be introduced to a visiting "brother." Unlike Robert Hester, Mr. Jameson exhibited no reluctance to conduct any and all types of attacks. From his first meeting on, Jameson suggested that he would "do anything for 'the cause.'" He expressed immediate delight at the prospect of helping ISIS, indicated he had proactively studied how to make bombs, explained he knew how to drive a truck, said he was willing to travel to Syria, and relayed that he had already prepared to execute an attack on Pier 39 in San Francisco. He explained that he would first use a bomb to funnel damage into tourist crowds, then follow-up with targeted

---

[12] Case. No. 18-00001-LJO, Eastern District of California, 2018. The facts are found in the plea agreement, available online at D.E. 22.

gunfire to expand the casualties and panic.

Jameson was not slowly brought around to buying hardware supplies. Instead, Jameson was the one who suggested the agent help *him* carry-out an attack, indicating that he just needed logistical support for his proposed operation. Jameson even drafted a speech for the martyrdom video he intended to publish in conjunction with his attack. As the time for the attack neared, Jameson sent the undercover agent photographs and maps and designated a specific date for his planned attack. Like in this case, agents decided to set a planned meeting at a storage shed for the moment of arrest. However, at the last minute, an agent mistakenly tipped Jameson to the fact that the "brother" was a government agent, prompting Jameson to no-show and refuse to return calls. On December 20, 2017, agents executed a search warrant. They arrested Jameson, and found his planned attack speech, his prepared will, and numerous firearms. Even after arrest, Jameson continued to stand-by his support for ISIS, call for attacks against the United States, and indicate he hoped someone would carry out an attack for him.

Mr. Jameson was sentenced to 15 years in prison and lifetime supervised release.

### B. United States v. Jalloh[13]

Mohammed Jalloh, a former National Guard Soldier, travelled to Africa and repeatedly attempted to join ISIL over a period of six months. He travelled with ISIL members, met with their agents, provided them money to move recruits from country to

---

[13] Case. No. 16-cr-00163-LO-1, Eastern District of Virginia. See Government sentencing memo at D.E. 48

country, and then proposed to return to the United States and plan an attack using his status as a Guardsmen. Jalloh met with undercover US agents and asked if he could help identify the targets for an attack. Once that was complete, Jalloh sent money to people he believed to be ISIL members to use to support the attack. Jalloh then travelled across several states attempting to buy assault rifles. After acquiring and test-firing an assault rifle (then rendered inoperable without his knowledge), Jalloh was stopped and arrested before he could carry-out his plan.

Jalloh was sentenced in 2017 to 11 years' (132 months) confinement and five years of supervised release.

### C. United States v. Ferdaus[14]

According to the Department of Justice press release from 2017:

Ferdaus began designing and constructing detonation components for improvised explosive devices (IED) using mobile phones. Ferdaus supplied 12 mobile phones, which he modified to act as an electrical switch for an IED, to FBI undercover employees (UCEs), whom he believed were members of al Qaeda, with the intention that they be used to kill U.S. soldiers overseas. In June 2011, Ferdaus delivered his first mobile phone detonation device to the UCEs. At a subsequent meeting, the UCEs falsely told Ferdaus that his first phone detonation device had succeeded in killing three U.S. soldiers and injuring others in Iraq. Ferdaus responded, "That was exactly what I wanted" and that he felt "incredible....We're changing the world." He also suggested that he could make "20 to 30 [detonation components] per week" to send to his "brothers overseas."

He told the UCEs that he was "100 percent" at "peace" with the fact that his devices "are killing American soldiers" and was "so happy to hear that and so thankful." After each subsequent delivery to the UCEs, Ferdaus asked how each detonation device had worked and how many Americans had

---

[14] Available online at https://archives.fbi.gov/archives/boston/press-releases/2012/man-sentenced-in-boston-for-plotting-attack-on-pentagon-and-u.s.-capitol-and-attempting-to-provide-detonation-devices-to-terrorists

reportedly been killed. Ferdaus also made a 20-minute training video, which was recorded by the UCEs, giving instructions on how to make cell phone detonators. Ferdaus believed that the video would be used for training members of al Qaeda.

Ferdaus also planned to obtain a remote-controlled aircraft similar to a small drone aircraft, fill it with grenades, and fly the plane into the Pentagon using a built-in GPS system. Ferdaus told the UCEs that he conducted Internet research on remote-controlled aircraft and found a website that sells such airplanes, which can fly 100 mph.

According to the prosecutor, in May and June 2011, Ferdaus provided two very detailed attack plans to the UCEs. The defendant's first attack plan, among other things, contained photographs of the Pentagon and U.S. Capitol with superimposed arrows, showing where he intended to strike. The defendant stated that his plan "ought to terrorize...it ought to result in the downfall of this entire disgusting place. That is my goal."

In May 2011, Ferdaus traveled to Washington, D.C., where he conducted surveillance, and photographed the Pentagon and Capitol Building. He also identified and photographed sites at the East Potomac Park, in Washington, D.C., from which he planned to launch his airplanes filled with explosives.

In June 2011, Ferdaus informed the UCEs that he had decided to expand his attack plan to include a ground assault on the Pentagon and requested that the UCEs supply him with explosives, grenades, fully automatic weapons, and a silencer. Ferdaus then rented space at a storage facility under a false name, where he planned to store and prepare the components for his attack plan. In July 2011, Ferdaus placed an order with a Florida distributor for a remote controlled aircraft under a false identity. He told the UCEs that he wanted them to get him 24 pounds of plastic explosives to maximize the attack. He explained that 15 of the 24 pounds of explosives were for the planes—five pounds per plane. Ferdaus later increased his request to 25 pounds of explosives.

In September 2011, Ferdaus instructed the UCEs to deliver C-4 explosives, three grenades, and six fully automatic AK-47 assault rifles to him, which he later received at the storage facility he rented. Ferdaus inspected the explosives and firearms and placed some of the C-4 explosives inside the remote-controlled aircraft he had previously ordered.

Shortly after receiving the explosives and weapons in the storage facility, Ferdaus was arrested. The public was never in danger from the explosive devices, which were closely monitored by the UCEs. Ferdaus was under surveillance as his alleged plot developed and the UCEs were in frequent contact with him.

During their communications with him, the UCEs told Ferdaus more than 25 times that he did not have to go through with his plan to attack the Pentagon and Capitol, that there was no shame in backing out, and that he could turn back at any time. In response to these inquiries, Ferdaus repeatedly reaffirmed his commitment to his attack plans and his hope to cause mass destruction and psychological harm to the United States.

Mr. Ferdaus was sentenced to 17 years in prison and 10 years of supervised release.

### D. United States v. Qamar

In 2017, Haris Qamar was sentenced to 102 months in prison and 20 years of supervised release for provided material support to ISIL. According to the DOJ press release:[15]

Qamar and an FBI Confidential Witness (CW) discussed ISIL's need for photographs of possible targets in and around Washington, D.C., for use in a video that ISIL purportedly was making to encourage lone-wolf attacks in the Washington, D.C., area. Qamar offered the CW ideas of what to photograph, including the Pentagon and numerous landmarks in Arlington, Virginia, and Washington, D.C., which could be targeted for terrorist attacks. On June 3, 2016, a conversation was audio and video recorded when the CW picked up Qamar in a vehicle and drove to area landmarks on the list Qamar previously developed. Qamar said "bye bye DC, stupid ass kufar, kill'em all." Qamar and the CW met again on June 10, 2016, and drove to a location in Arlington to take additional photographs for the purported ISIL video.

According to the statement of facts, during numerous conversations with the CW, Qamar expressed his interest and excitement in the extreme violence associated

---

[15] Available online at https://www.justice.gov/opa/pr/virginia-man-sentenced-102-months-prison-attempting-provide-material-support-isil

with ISIL. Qamar said he loved the bodies, blood, and beheadings. He recalled watching a video of a Kurdish individual being slaughtered and he liked the cracking sound made when the individual's spinal cord was torn. On several occasions, Qamar said he could slaughter someone and described how he would do it. Qamar also stated he admired lone-wolf attackers because they love Islam so much that they are willing to die as martyrs for Islam. In the same conversation, Qamar and the CW also discussed suicide bombings. The CW said the CW did not believe in suicide bombings, but Qamar responded, "I believe in it 100 percent."

According to the statement of facts, on Sept. 11, 2015, terrorists connected with ISIL posted a "kill list" to the internet containing the names and addresses of U.S. military members. A few days later, Qamar told CW that the residences of several service members who appeared on the "kill list" were near Qamar's home, and Qamar observed undercover police cars near those residences. On Sept. 16, 2015, Qamar tweeted his prayer that Allah "give strength to the mujahideen to slaughter every single US military officer."

Moreover, according to the statement of facts, on Sept. 25, 2015, Qamar told the CW that he tried to join ISIL in 2014, and purchased a plane ticket from Newark, New Jersey, to Istanbul, Turkey. Qamar, however, did not show up for the flight because his parents prevented him from doing so; Qamar's parents took his passport. Qamar said his parents threatened to notify law enforcement and said he fought with his father and called his father a traitor to Islam.   On Nov. 18, 2015, the CW asked Qamar if his father gave him back his passport, would Qamar travel overseas and join ISIL. In response, Qamar said if that happened, "I'm done, I leave."

**E.  United States v. Loewen[16]**

Terry Loewen was sentenced to 20 years in prison and lifetime supervised release,

despite being over 60 years old, after he attempted to bomb the Wichita Mid-Continent

Airport.   According to the agreed facts of the case, Mr. Loewen talked to undercover

agents and then:

The defendant responded that he was inspired by the teachings of Osama bin Laden and Anwar al Awlaki and stated that he had downloaded "tens of thousands

---

[16] Case No. 13-10200-MLB, District of Kansas, 2013; Docket Entry 108

of pages" of material concerning jihad, martyrdom operations and implementation of Sharia law, that he read Inspire magazine, and that he'd become "radicalized." The defendant offered FBI Employee 1 a tour of the Wichita airport, where he worked, and said that he was willing to commit violence against a civilian target. The defendant told FBI Employee 1 that he did not envision himself living through any of the plans he had in mind.

In September 2013, the defendant sent photos to FBI Employee 1 of what appeared to be tighter jet trainers on the tarmac outside his hanger. The defendant told FBI Employee 1 that it would have been possible for him to have "walked over there, shot both pilots ... , slapped some C4 on both fuel trucks and set them off before anyone even called TSA." The defendant also indicated to FBI Employee 1 that he was waiting for what he called "the green light" from Allah to perform this sort of operation.

On October 3, 2013, the defendant reiterated to FBI Employee 1 that he was interested in a "martyrdom operation," meaning an operation in which the defendant martyred himself to advance the purposes of Al Qaeda in the Arabian Peninsula (AQAP). The defendant ultimately told FBI Employee 1: "I stated last week that I would decide by today if I'm in or out - count me in for the duration."

By now the FBI had decided to introduce an undercover employee to the defendant to determine how far the defendant was willing to take his stated desires to commit violent jihad. On October 25, 2013, the defendant met in person with FBI Employee 2, whom he believed was a "brother" associated with AQAP. During the meeting the defendant stated his desire to help FBI Employee 2 with a mission to blow up a plane with numerous people on board. The defendant had scouted the airport at this point, and he informed FBI Employee 2 when would be the best time for an attack and how many planes would be on the ground in the area. Just a week later, the defendant met again with FBI Employee 2, and he volunteered to martyr himself in any proposed operation. The defendant also expressed his desire to kill as many people as possible, and he placed an "X" on a map of the airport terminal that he provided to FBI Employee 2 showing where to park a vehicle full of explosives to accomplish that goal.

The defendant continued to meet with FBI Employee 2 and, in mid December 2013, the defendant assisted FBI Employee 2 in the final assembly of a vehicle-borne improvised explosive device (VBIED). Both agreed that Friday, December 13, 2013, would be the best day to execute their plan, and Loewen stated that he was happy that this was going to happen soon. In the early hours of December 13, 2013, FBI Employee 2 picked up Loewen at a Wichita hotel. The two drove to the

location where the bomb was being stored, and Loewen finished wiring the device, believing it would be rendered operational. Loewen and FBI Employee 2 departed their location and began their route to Wichita Mid-Continent Airport. Next, FBI Employee 2 and Loewen arrived at the gate where Loewen had previously tested his badge to ensure entry was possible. Loewen climbed from the vehicle and attempted to use his badge twice on the card reader access panel in order to gain entry to the tarmac. Loewen was taken into custody after his two attempts at opening the gate. The defendant left a letter dated December 11, 2013 for a family member describing his intent to conduct a martyrdom operation and describing himself as a terrorist. In addition, after the defendant was arrested, agents conducted a forensic examination of the defendant's home computer. The examination revealed that the defendant had been researching violent jihad for many years prior to being investigated- and then contacted - by the FBI.

## III.    The Guidelines

The Guidelines require this Court to treat Mr. Hester as a Criminal History Category VI offender.   The Sentencing Commission has offered no empirical basis for this requirement.   The government cites case law for the proposition that "[E]ven terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of recidivism, and the need for incapacitation." (D.E. 53 at page 8).   However, that quote came from a 2nd Circuit case that occurred shortly after 9/11. While the court suggested that possibility, the proposition was neither questioned nor argued because the 2nd Circuit specifically identified that while a hypothetical defendant might object to the Guideline requirement, the defendant in their case "has an extensive history of crime" and had "conceded that he was a long-time criminal, a 'semi-retired con man…a two-bit thief.'"

While counsel can find no evidence to support the underpinning of the government's claim, there is abundant research and legal study suggesting that

defendants who provide material support to terrorist organizations present widely different attitudes towards correction and rehabilitation.

As a first example, the Counter-Extremism Project published a 62 page, multi-national study in August of 2018 that examined professional correctional efforts to rehabilitate terrorism inmates.[17]   After studying hundreds of cases in the United States, the United Kingdom, Canada, Australia, France, and Denmark, the authors of the meta-study found that of the inmates they investigated, some "remain bitter and dangerous, while others attempt a new path."[18]   The researchers noted in particular the great value of "repentant and voluntarily disengaged terrorists to help counter violent extremism by reducing the allure of involvement to would-be recruits and deconstructing the myths that feed recruitment narratives."[19]  In fact, when the paper was presented at the Heritage Foundation in December of 2018, one of the invited speakers, sponsored by the United States government, was speaking from experience.[20]   Beginning at 4:05 in the video, we hear from Jesse Morton (formerly known as Younes Abdullah Mohammed). Mr Morton was abused as a child and struggled with drug use, PTSD and bipolar disorder. As a teen, he felt ostracized by society. He was introduced to Malcom-X style Islam. He became a revert and began to seek out jihadi propaganda.   He eventually co-founded "Revolution

---

[17]  Available online at
https://www.counterextremism.com/sites/default/files/CEP%20Report_When%20Terrorists%20Come%20Home_120618.pdf
[18]  Id. at page 2.
[19]  When Terrorists Come Home at page 35, citing a 2012 Georgetown study.
[20]  https://www.heritage.org/terrorism/event/when-terrorists-come-home-rehabilitation-americas-convicted-islam

Muslim." Within the first several years after 9/11, he had become one of the most influential Jihadi propagandists in the world.   He eventually threatened to kill the creators South Park and fled the United States.   He was eventually caught in Morocco, was extradited to the United States, and was sentenced to 11.5 years in prison.[21]   Mr. Morton engaged in self-study and began to reflect on what he had consumed.   He learned that the type of Islam he had been exposed to had actually been a politicized and radicalized form of Islam targeted at men such as himself.   He began to realize that the message of hate he had accepted was inconsistent with the word of the Koran.   He started to work with the FBI to target jihadists and fight terrorist propaganda.   He was ultimately released in 2015 and continued to work as a government informant until he was outed by reporters.

The Yale Law Journal also examined this issue in a 57-page special feature. The Journal found that while some defendants are truly radicalized and fervent actors, others are "young, disaffected American Muslims with little to no criminal history, whose anger over the killings of Muslims throughout the Middle East and the discrimination against Muslims in the United States has made them susceptible to the views of terrorist groups like ISIS."[22]   The law journal noted that these particular defendants frequently include those "who ha[ve] shown no signs of mastering basic life functions, let alone carrying out a serious terror attack, and ha[ve] no known involvement with actual terrorist groups"

---

[21] https://www.adl.org/blog/younes-abdullah-muhammad-pleads-guilty-to-threatening-south-park-creators
[22] See https://www.yalelawjournal.org/pdf/h.1520.Ahmed.1576_rfyg9e76.pdf

other than their contact with undercover agents.[23]

      While the justification for the treatment of these defendants as Criminal History Category VI offenders was a belief that anyone providing material support was an ideologue of such deep, fervent conviction that they "cannot be reasoned with,"[24] MI5 of Britain found otherwise. After studying homegrown supports in detail, MI5 identified a separate sub-group of material supporters that parroted jihadi propaganda and acted to help jihadi movements, but whose ideas were much less entrenched. MI5 reported that these young men were identifiable because, "[f]ar from being religious zealots, a large number of those involved in terrorism do not practise their faith regularly. Many lack religious literacy and could actually be regarded as religious novices."[25] The United States government has also realized that not all of these young men are alike. In fact, there is an increasing awareness that such men, once separated from propaganda and given the opportunity to reflect, can and do change their thinking. Furthermore, such men can then become a valuable tool in speaking to other disaffected youth. Such personal accounts can serve as a tool in the counter-terrorism effort because personal account videos can be posted on the very social media websites such as Youtube that were used to initially radicalize the speakers.[26]

---

[23] Id. at 1542.
[24] Id at
[25] Id at 1549.
[26] See e.g. 2015 Homeland Security Committee's "Combating Terrorist and Foreign Fighter Travel Report" available online at https://perma.cc/656H-TWT7 at page 37.

## IV.  Conclusion

Mr. Hester's conduct in this case was significant and severe.   This Court has before it the option of a lifetime of supervision. This Court also has before it facts that suggest Robert Hester was not a trained and proactive would-be martyr, but was instead something less.   Mr. Hester's crime will require him to serve out his time in a USP, where the conditions are the hardest and most dangerous, especially for someone with his background and charges.   The Court will hear from Robert Hester and a family representative at sentencing.   This Court will see that Mr. Hester is legitimately remorseful for his conduct, has addressed many of the issues that led him to committing this offense, is committed to keep working on his issues, and is committed to serving our community the best he can going forward.

For all these reasons, counsel will respectfully ask this Court to impose a sentence of 15 years' confinement.

*/s/ Troy K. Stabenow*
**TROY K. STABENOW,** # 57067
Assistant Federal Public Defender
80 Lafayette Street, Suite 1100
Jefferson City, Missouri 65101
(573) 636-8747
Attorney for Defendant

February 18, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of February, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants in this case, and a copy was mailed, via the United States Postal Service, to all non-CM/ECF participants.

*/s/ Troy K. Stabenow*
**TROY K. STABENOW**